# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY BICKHART, Administratrix of the Estate of TEASIA M. LONG | : | NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION |
| JOHN WETZEL, in his Official Capacity, | : | |
| ROBERT SMITH, in his Official Capacity, | : | |
| CANDY OTTE, RN, in her Individual and/or Official Capacities, JOHN/JANE DOES 1-5, in their Individual and/or Official Capacities, JESSIE AYERS, PA-C, ERIN BROWN, CRNP, and MHM CORRECTIONAL SERVICES, INC. | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

AND NOW, comes the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, who files this Complaint against the Defendants, and states as follows:

## PARTIES

1.     The Plaintiff, Nancy Bickhart, of Middleburg, Pennsylvania, is the Administratrix of the Estate of Teasia M. Long, having been granted letters of administration by the Snyder County Register of Wills on January 19, 2016.

2.     The Defendant, John Wetzel, in his official capacity, was, at all times relevant, the Secretary of Pennsylvania's Department of Corrections, and had supervisory authority over all DOC facilities, including SCI Muncy.

3.     The Defendant, Robert Smith, in his official capacity, was, at all times relevant, the Superintendant of State Correctional Institution at Muncy ("SCI Muncy"), where Teasia Long was incarcerated and ultimately died, and had supervisory authority over the facility and its personnel.

4.     The Defendant, Candy Otte, RN, in her individual and/or official capacity, was, at all times relevant, a nurse working at SCI Muncy.

5.     The Defendant, Jessie Ayers, PA-C, was, at all times relevant, a physician's assistant working at SCI Muncy on contract.

6.     The Defendants, John/Jane Does 1-5, in their official and/or individual capacities, were, at all times relevant, SCI Muncy staff involved in the supervision and care of Teasia M. Long.  Defendants John/Jane Does 1-5 have yet to be identified by the Plaintiff.

7.     The Defendant, Erin Brown, CRNP, was, at all times relevant, a nurse working at SCI Muncy on contract.  Upon information and believe, Erin Brown was employed by and was an agent of MHM Correctional Services, Inc.

8.     The Defendant, MHM Correctional Services, Inc., is a contract healthcare provider to Pennsylvania's Department of Corrections, which, at all

times relevant, provided mental health services at SCI Muncy.  MHM Correctional

Services, Inc. is based in Virginia, and has a regional office at 5115 East Trindle

Road, Mechanicsburg, PA 17050, which is within this District.

## VENUE AND JURISDICTION

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), since

all the events giving rise to the Plaintiff's claims occurred in this District.

10.    This Court has jurisdiction over this case pursuant to 28 U.S.C.

§ 1331, which gives U.S. district courts jurisdiction over all civil actions arising

under the Constitution, laws or treaties of the United States.

## FACTS

11.    On February 3, 2014, Teasia Long, then 17-years-old, set fire to the

home she shared with her aunt and uncle.

12.    On March 11, 2015, Teasia pled "guilty but mentally ill" under 18 Pa.

C.S. § 314 to charges of attempted homicide and arson.  *See* Snyder County CP-

55-CR-0000040-2014.

13.    As a result, Teasia was sentenced to 9 to 40 years in prison.  *See*

Snyder County CP-55-CR-0000040-2014.

14.    On March 20, 2015, Teasia arrived at SCI Muncy in Muncy,

Pennsylvania to begin serving her prison sentence.

15.    Roughly two months later, on May 24, 2015, Teasia committed suicide by hanging herself with a bed sheet in her cell.

16.    Teasia's suicide was preventable had the Defendants not been grossly negligent and/or deliberately indifferent with regard to Teasia's risk of suicide and mental health needs.

## THE DEFENDANTS KNEW OF TEASIA'S PARTICULAR VULNERABILITY TO SUICIDE

17.    Almost immediately upon arrival, the Defendants became aware of Teasia's particular vulnerability to suicide.

18.    On March 17, 2015, three days prior to Teasia's arrival at SCI Muncy, Teasia's health information was transferred from Snyder County Prison to SCI Muncy.

19.    The transferred health information, which was received by SCI Muncy and seen by SCI Muncy personnel, indicated that Teasia was particularly vulnerable to suicide.

20.    The transferred health information stated that Teasia had chronic/acute psychological/mental health problems.

21.    The transferred health information stated that Teasia suffered from bipolarity, anxiety, depression, and PTSD.

22.    The transferred health information stated Teasia had a history of substance abuse, specifically with inhalants.

23.    The transferred health information stated Teasia had a history of suicide attempts, specifically two prior such attempts.

24.    On March 20, 2015, Teasia was subject to an initial screening by Candy Otte, RN that included a mental health review.

25.    As part of Teasia's initial screening, Nurse Otte had access to and reviewed this health information transferred from Snyder County Prison to SCI Muncy.

26.    During Nurse Otte's March 20, 2015 mental health review, she noted that Teasia exhibited many signs indicating that she was particularly vulnerable to suicide.

27.    Nurse Otte noted Teasia had a history of depression.

28.    Nurse Otte noted Teasia showed evidence of recent self-mutilation.

29.    Nurse Otte noted Teasia had two previous suicide attempts.

30.    Nurse Otte noted Teasia had "many" psychiatric hospitalizations, outpatient treatments, and/or partial hospitalizations between 2009 – 2013.

31.    Nurse Otte noted Teasia had a history of bipolarity, ADHD, OCD, and PTSD.

32.    In addition, during Teasia's initial screening, Nancy, Teasia's aunt, spoke with an SCI Muncy staff member and informed them that Teasia needed to be watched closely because she would try to commit suicide.

33.     Upon information and belief, Nancy spoke directly with Nurse Otte during Teasia's initial screening and relayed this statement about Teasia's particular vulnerability to suicide.

34.     Nurse Otte did not record Nancy's warning in Teasia's records.

35.     A week later, on March 27, 2015, Teasia was subjected to a physical examination by Jessie Ayers, PA-C, who was then an SCI Muncy physician's assistant.

36.     During the physical examination, Ms. Ayers noted that Teasia had scars on her neck and arms from suicide attempts.

37.     In fact, Teasia had massive, glaring scars on her arms and wrists due to a previous suicide attempt.

38.     Anyone who met Teasia noticed the scars, and every person at SCI Muncy who came into contact with her would have seen them.

39.     Also on March 27, 2015, Teasia also had her first meeting with Erin Brown, CRNP, who provided outpatient psychiatric services at SCI Muncy through MHM Correctional Services, Inc.

40.     Teasia again met with Ms. Brown on April 24, 2015.

41.     Ms. Brown was also aware of multiple signs that Teasia was particularly vulnerable to suicide.

42.    On April 24, 2015, Ms. Brown noted that Teasia was committed to SCI Muncy after a plea of "guilty but mentally ill" ("GBMI").

43.    Ms. Brown noted that Teasia had a history of hospitalizations.

44.    Ms. Brown noted that Teasia had previously attempted suicide.

45.    Ms. Brown noted Teasia's history of inhalant abuse.

46.    Ms. Brown confirmed Teasia's prior diagnoses of depression, PTSD, bipolarity, OCD, and ODD.

47.    Ms. Brown further diagnosed Teasia with borderline personality disorder ("BPD").

48.    One of BPD's most well-known symptoms is an increased risk of suicide, i.e. because Teasia had BPD, she was especially vulnerable to suicide.

49.    Based on the above information, which was known to Nurse Otte, Ms. Ayers, and Ms. Brown, Teasia met the DOC's criteria for an inmate that was particularly vulnerable to suicide.

50.    DOC policy lists specific factors that indicate suicide risk, including:

a.    whether an inmate has experienced one or more prior suicide attempts;

b.    whether an inmate has a history of depression;

c.    whether an inmate was a recent transfer from another state or county facility;

        d.      whether an inmate has a history of alcohol and/or drug abuse; and,

        e.      whether an inmate engages in self-injurious behaviors; and,

        f.      whether an inmate has a serious illness.

51.    Teasia met each of these criteria indicating she was particularly vulnerable to suicide, in that:

        a.      Teasia had multiple prior suicide attempts;

        b.      Teasia had a history of depression;

        c.      Teasia was recently transferred from Snyder County Prison;

        d.      Teasia had a history of drug/alcohol abuse;

        e.      Teasia had recently engaged in self-injurious behaviors; and,

        f.      Teasia had a serious illness (i.e. BPD).

52.    Based on this information, which was actually known to the Defendants, there was a strong likelihood that Teasia would commit self-inflicted harm.

## THE DEFENDANTS ACTED WITH GROSS NEGLIGENCE AND/OR DELIBERATE INDIFFERENCE TO TEASIA'S PARTICULAR VULNERABILITY TO SUICIDE

53.    When Teasia arrived at SCI Muncy on March 20, 2015, the Pennsylvania Department of Corrections ("DOC") had an extensive policy

directing prisons and their staff on how to classify, track, evaluate, and treat mentally ill inmates, including how to assess and treat suicide risk.

54.    The DOC's policies in this regard reflected the "minimum standard [to] be achieved" at SCI Muncy.

55.    The Defendants, however, failed to adhere to multiple DOC policies in Teasia's case.

56.    First, DOC policy as of March 20, 2015 when Teasia entered the state prison system dictated that every inmate with mental illness be tracked through the DOC's Mental Health/Intellectual Disability ("MH/ID") Tracking System.

57.    DOC policy required mandatory placement on the MH/ID roster if the inmate pled "guilty but mentally ill," as Teasia did.

58.    SCI Muncy and SCI Muncy personnel, including each of the Defendants, were aware that Teasia pled "guilty but mentally ill" ("GBMI") in Snyder County.

59.    As such, per DOC policy, as a GBMI inmate, Teasia should have automatically been placed on the MH/ID roster under "Stability Code C."

60.    Teasia should have received a host of mental health services because she met the criteria for placement on the MH/ID Stability C roster.

61.     Teasia, however, did not get the mental health services DOC policy dictated she receive in the 65 days between her arrival at SCI Muncy and her suicide.

62.     An inmate classified as MH/ID Stability C due to GBMI commitment is considered to have "present mental health needs."

63.     Per DOC policy, a GBMI prisoner is supposed to be visited by the prison's Mental Health Coordinator ("MHC") no later than one working day after reception.

64.     Upon information and belief, Teasia was never visited by SCI Muncy's MHC.

65.     Likewise, SCI Muncy's Psychological Services Specialist ("PSS") should have seen Teasia for an initial evaluation one working day after reception at SCI Muncy.

66.     Upon information and belief, Teasia never saw SCI Muncy's PSS.

67.     According to DOC policy, a GBMI inmate like Teasia is supposed to meet with a counselor assigned to her case once a week.

68.     Upon information and belief, Teasia did not meet with a counselor at SCI Muncy once a week.

69.     In addition, per DOC policy, as a GBMI and MH/ID Stability C inmate, Teasia should have been scheduled for a psychiatry review team ("PRT") meeting within 14 days, or by April 3, 2015.

70.     Upon information and belief, Teasia never met with SCI Muncy's PRT.

71.     Had the Defendants done the things DOC policy required as outlined above, Teasia would not have committed suicide.

72.     Also, given what Nurse Otte, Ms. Ayers, and/or Ms. Brown knew about Teasia's particular vulnerability to suicide, they should have referred her for more comprehensive psychiatric/psychologist services, including medications and additional counseling, which they did not.

73.     After Ms. Brown evaluated Teasia, she had an ongoing obligation to ensure that Teasia was properly treated for her mental health conditions.

74.     Given Teasia's mental health conditions, it should have been apparent to Ms. Brown that Teasia posed a substantial risk that she would self-harm.

75.     Despite that, Ms. Brown failed to recommend to SCI Muncy adequate care for Teasia and/or provide Teasia adequate care.

## SCI MUNCY AFFIRMATIVELY EXACERBATES AND THEN FAILS TO SCREEN FOR TEASIA'S SUICIDE RISK

76.     For unknown reasons, on May 15, 2015, Teasia was transferred into SCI Muncy's Restrictive Housing Unit, or "RHU."

77.    The RHU is a housing unit that restricts an inmate's access to the outside world and interactions with other inmates and guards.

78.    Inmates housed within the RHU are confined to their cell for a minimum of 23 hours per day, 7 days a week.

79.    Teasia's transfer to the RHU was approved by John Doe, LPN, without regard for Teasia's mental health needs and without regard for whether the RHU would exacerbate Teasia's suicidal tendencies.

80.    Upon information and belief, Ms. Brown was not consulted when Teasia was transferred to the RHU.

81.    DOC policy explicitly states that placement in the RHU increases an inmate's risk of suicide.

82.    As a result, due to her May 15 transfer to the RHU, per DOC policy Teasia faced an *even higher* risk of suicide than when she arrived at SCI Muncy, when she was already especially vulnerable to suicide.

83.    Because of the increased suicide risk in the RHU, DOC policy directs that psychological staff and/or nursing staff will assess every inmate placed into an RHU for suicide potential within 24 hours.

84.    In addition, DOC policy directs the ranking correctional officer in the RHU to complete a Suicide Risk Indicators Checklist for a newly admitted RHU inmate.

85.   That John Doe ranking correctional officer did not assess Teasia's suicide risk as required.

86.   Between May 15 and May 24, when Teasia committed suicide, she was never assessed for suicide potential in the RHU in direct violation of these DOC policies.

87.   Had the Defendants assessed Teasia for suicide potential between May 15 and May 24 as directed by DOC policy, Teasia would not have committed suicide.

## SCI MUNCY LACKED ADEQUATE TRAINING AND HAD AN UNCONSTITUTIONAL PRACTICE OF HOUSING MENTALLY ILL INMATES IN THE RHU

88.   Secretary John Wetzel and Superintendent Robert Smith had an obligation to train SCI Muncy staff, with regard to DOC policy for handling suicidal, mentally ill inmates.

89.   Given the failure of SCI Muncy to follow DOC policy in Teasia's case, such training must not have occurred or was inadequate.

90.   In the alternative, Secretary John Wetzel and/or Superintendent Smith acquiesced in a practice or custom of ignoring DOC policy for handling suicidal, mentally ill inmates.

91.     In addition, at all times relevant, SCI Muncy had an unconstitutional policy or practice of housing mentally ill inmates in the RHU, despite their conditions, thereby exacerbating their mental illness.

92.     Teasia was a victim of this unconstitutional policy, in that it led to her suicide.

93.     In 2013, the DOC was sued by the Disability Rights Network of Pennsylvania in this Court for the DOC's unconstitutional policy of housing inmates with serious mental illness in RHUs in a manner that took no account of and exacerbated their mental illness.  *See* Case No. 1:13-CV-00635.

94.     In January 2015, the DOC entered into an agreement with the Disability Rights Network.

95.     The agreement was in its "Transition Period" at the time Teasia committed suicide.

96.     As part of the agreement's "Transition Period," the DOC, including SCI Muncy, agreed to only house inmates with serious mental illness in an RHU under "Exceptional Circumstances."

97.     Here, upon information and belief, "Exceptional Circumstances" did not exist to justify Teasia's placement in the RHU.

98.     In addition, the agreement required psychology staff to interview and assess each inmate with serious mental illness placed in an RHU within seventy-

two (72) hours of initial placement in the RHU, and no less than every seven (7) days thereafter.

99.    Here, as described, Teasia was not evaluated by psychology staff at any point during her confinement to the RHU before her suicide.

100.    As such, the DOC and/or SCI Muncy violated the agreement entered into with the Disability Rights Network.

## SCI MUNCY ISSUES A MISLEADING STATEMENT REGARDING HER DEATH

101.    After Teasia died, SCI Muncy issued a statement indicating that Teasia was being held in SCI Muncy's "Diversionary Treatment Unit" when she committed suicide.

102.    Teasia's prison records, however, state clearly that she was held in SCI Muncy's RHU when she died.

103.    In fact, the DOC's "Diversionary Treatment Unit" policy did not take effect until 2 days after Teasia committed suicide.

104.    SCI Muncy's statement further stated Teasia was being seen by a "team of mental health specialists."

105.    SCI Muncy's statement was wrong, as Teasia's records reflect she was seen by a single mental health professional, Erin Brown, CRNP, during her time at SCI Muncy.

106.   SCI Muncy's statement further said "there was no indication [Teasia] was going to harm herself."

107.   Again, SCI Muncy's statement is incorrect, as Teasia exhibited multiple signs that she was particularly vulnerable to suicide, as outlined above.

108.   Due to the actions and omissions of the Defendants as described herein, Teasia Long committed suicide.

## COUNT I

## SUPERVISORY LIABILTITY UNDER 42 U.S.C. § 1983

## Plaintiff v. Defendants Secretary John Wetzel and Superintendent Robert Smith, in their Official Capacity

109.   The allegations throughout this Complaint are incorporated by reference as if set forth at length.

110.   At all times relevant, these Defendants owed a duty to Teasia Long not to violate her 8th Amendment rights.

111.   The Defendants violated Teasia Long's 8th Amendment rights in the following manner:

a.   The Defendants were aware of SCI Muncy's unconstitutional policy, practice, and/or customs with regard to the treatment and housing of mentally ill inmates;

b.      The Defendants were aware of a need to train SCI Muncy personnel to provide adequate mental health care and screen for suicide risk, particularly within the RHU;

c.      The Defendants were aware that having such policies, practices, and/or customs, or not adequately providing such training, created an unreasonable risk of inmate suicides;

d.      The Defendants exhibited deliberate indifference to that risk, as the Defendants were aware, at all times relevant, that prisoners face a risk of suicide and SCI Muncy prisoners specifically face such risk.

112.   Due to the actions and omissions of the Defendants, Teasia Long committed suicide.

WHEREFORE, the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, claims damages of the Defendants, jointly and severally, in addition to any other relief this Court deems appropriate.

## COUNT II

### INDIFFERENCE TO RISK OF SUICIDE - 42 U.S.C. § 1983

### Plaintiff v. Defendants Candy Otte, RN and John/Jane Does #1-5

113.   The allegations throughout this Complaint are incorporated by reference as if set forth at length.

114.   At all times relevant, the Defendants owed a duty to Teasia Long not to violate her 8th Amendment rights.

115.   The Defendants violated Teasia Long's 8th Amendment rights in the following manner:

      a.      Defendants knew the detainee had a particular vulnerability to suicide;

      b.      Defendants knew or should have known of that vulnerability; and,

      c.      Defendants acted with reckless and/or deliberate indifference to that risk of suicide.

116.   Due to the actions and omissions of the Defendants, Teasia Long committed suicide.

WHEREFORE, the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, claims damages of the Defendants, jointly and severally, in addition to any other relief this Court deems appropriate.

## **COUNT III**

### **MEDICAL PROFESSIONAL LIABILITY - GROSS NEGLIGENCE**

### **Plaintiff v. Defendants Jessica Ayers, PA-C, Erin Brown, CRNP, and MHM Correctional Services, Inc.**

117.   The allegations throughout this Complaint are incorporated by reference as if set forth at length.

118.   At all times relevant, the Defendants owed a professional duty to Teasia Long to perform their duties in accordance with the applicable standard of care and to not subject Teasia Long to harm.

119.   The Defendants violated their duties, and were grossly negligent in the following manner:

  a)   failing to properly diagnose and address Teasia Long's mental illness;

  b)   failing to properly diagnose and address Teasia Long's suicide risk;

  c)   failing to properly conduct a suicide risk assessment;

  d)   failing to properly screen, interview, hire, and train employees/volunteers/contractors fit to care for the Decedent;

  e)   failing to properly warn relevant caregivers regarding Teasia Long's suicide risk; and,

  f)   failing to properly refer Teasia Long to appropriate health care professionals.

120.   Due to the actions and omissions of the Defendants, Teasia Long committed suicide.

WHEREFORE, the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, claims damages of the Defendants, jointly and severally, in addition to any other relief this Court deems appropriate.

## CAUSE OF ACTION

### Wrongful Death

### Plaintiff v. All Defendants

121.   The allegations throughout this Complaint are incorporated by reference as if set forth at length.

122.   The Plaintiff, Nancy Bickhart, is the duly qualified Administrator of the Estate of Teasia M. Long, and is thus entitled to bring this action under 42 Pa. C.S. § 8301.

123.   The Plaintiff, Nancy Bickhart, brings this action on behalf of the wrongful death beneficiaries, who are entitled by law to recover damages under Pennsylvania law.

124.   Teasia Long did not bring an action for their injuries during her lifetime, and no other civil action for her wrongful death has been commenced.

125.   Teasia Long's Estate has incurred medical, funeral, and burial expenses and otherwise sustained pecuniary loss.

126.   The Plaintiff, Nancy Bickhart, also asserts loss of services, support, companionship, comfort, and contribution of Teasia M. Long for and during the

expected remainder of her life and all available damages pursuant to 42 Pa. C.S. § 8301.

WHEREFORE, the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, claims damages of the Defendants, jointly and severally, in addition to any other relief this Court deems appropriate.

## CAUSE OF ACTION

### Survival

### Plaintiff v. All Defendants

127.   The allegations throughout this Complaint are incorporated by reference as if set forth at length.

128.   The Plaintiff, Nancy Bickhart, Administrator of the Estate of Teasia M. Long, brings this action on behalf of the Estate under 42 Pa. C.S. § 8302.

129.   The Plaintiff, Nancy Bickhart, hereby claims, on behalf of the Estate, the damages sustained by the Estate by reason of Teasia M. Long's death, including pain and suffering she experienced prior to death, loss of past and future earnings and income, and all other damages sustained by the Estate pursuant to 42 Pa. C.S. § 8302.

WHEREFORE, the Plaintiff, Nancy Bickhart, Administratrix of the Estate of Teasia M. Long, claims damages of the Defendants, jointly and severally, in addition to any other relief this Court deems appropriate.

Respectfully submitted,

**ANDREOZZI & ASSOCIATES, P.C.**

Date: May 18, 2017

*/s/ Benjamin D. Andreozzi, Esq.*
Benjamin D. Andreozzi, Esq. (ID #89271)
ben@victimscivilattorneys.com

/s/ Nathaniel L. Foote
Nathaniel L. Foote, Esq. (ID #318998)
nate@victimscivilattorneys.com

111 North Front Street
Harrisburg, PA 17101
717.525.9124 (Phone)
717.525.9143 (Fax)
*Attorneys for Plaintiff*